AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of South Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>A detached shed on the property at 15 Thistlewood Way,<br>Piedmont, South Carolina | )<br>)<br>) Case No. 6:20cr440<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

A detached shed on the property at 15 Thistlewood Way, Piedmont, South Carolina, more particularly described in Attachment A hereto, consisting of one page, which is incorporated by reference as fully set forth herin

located in the _____ District of ___South Carolina___, there is now concealed *(identify the person or describe the property to be seized)*:

The property described in Attachment B, which is incorporated by reference as if fully set forth herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 & 846 | PWID Controlled Substances and Conspiracy to PWID Controlled Substances |

The application is based on these facts:
See Affidavit submitted in support of this Application.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Appeared & sworn by telephone*

_____
s/ Justin K. Newsome
*Applicant's signature*

FBI Special Agent Justin K. Newsome
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: July 28, 2020

City and state: Greenville, South Carolina

_____
*Judge's signature*

Kevin F. McDonald, United States Magistrate
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | ) | CASE NO.: |
| OF THE UNITED STATES OF AMERICA | ) | |
| FOR AN ORDER AUTHORIZING A | ) | |
| SEARCH WARRANT OF A DETACHED SHED | ) | |
| ON THE PROPERTY AT 15 THISTLEWOOD | ) | |
| WAY, PIEDMONT, SOUTH CAROLINA | ) | |

I, Special Agent Justin K. Newsome, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the search of residence/business and premises described in Attachment A, B, and C of this Affidavit. I am a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice, and I have served in that capacity since November 2003. As part of my law enforcement duties, I am statutorily charged with investigating federal criminal violations, including the sale of illegal drugs, money laundering, wire fraud, and mail fraud. As a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I have been the investigating case agent involving numerous federal violations to include homicide, sexual assault, bank robbery, kidnapping, sale and distribution of illegal narcotics, firearms violations, possession and distribution of child pornography, bank, wire, and mail fraud, and fraud against the government. In the course of these investigations, I have obtained numerous search warrants, arrest warrants, and have been the Affiant for Title III affidavits.

2. As part of the aforementioned criminal investigations, I have received training, both formal and informal, in the investigation of violations of controlled substance, money laundering offenses, and mail and wire fraud violations. I have participated in the investigation, arrest, and prosecution of numerous drug traffickers. I am familiar with much of the terminology

and distribution methods used by drug traffickers, as well as the methods of packaging, transporting, and ingesting various types of controlled substances. I am also familiar with many of the methods individuals use to obtain money through fraudulent means and techniques employed to hide the proceeds from these fraudulent schemes from law enforcement and government entities. I have training and experience dealing with electronic evidence and prepared multiple search warrant affidavits supporting warrants for information maintained by telephone and internet service providers, authorizing forensic searches of cellular telephones, computers, and other electronic devices. The information contained in this affidavit is based on my personal knowledge acquired, and observations made, during the course of this investigation, as well as information provided to me by other third parties and law enforcement agents. Additionally, this affidavit is based upon my training and experience, as well as that of other law enforcement agents working with me in this investigation. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of the information regarding this investigation about which I, or the other agents involved in this investigation, have knowledge.

3. Based upon my training and experience, as well as the other sources of information indicated above, I know the following:

   a) Drug traffickers frequently store controlled substances and drug paraphernalia for packaging, diluting, weighing and/or distributing controlled substances in, on, and around residence and/or business, and within vehicles and/or structures located on their property or its surrounding curtilage in an effort to avoid detection by law enforcement. This paraphernalia often includes but is not limited to: scales, plastic bags, diluting agents, etc;

   b) Drug traffickers frequently store currency, financial instruments, precious metals, jewelry, and other items of value, which are the proceeds of drug transactions inside, on, and around their residence and/or place of business;

   c) Drug traffickers frequently have in their possession, whether on their person, inside their vehicle, or in, on, or around their residence, firearms and other weapons. These firearms and weapons are commonly used by drug traffickers to protect their property, including, but not limited to: controlled substances; drug proceeds in the

form of currency, jewelry and other real property; and other items of value whose existence may be considered illegal;

d) Drug traffickers frequently maintain in their residence and/or business, records of drug transactions, including notes, ledgers, receipts, computer files, photographs, video tapes, digital video recorders and associated hard drives memorializing footage generated by closed circuit or internet-based video camera systems, telephone records, calling cards, and correspondence which contain information on current and past associates, and may be used to identify co-conspirators who have not been identified or located;

e) Drug traffickers frequently maintain fictitious identification and other documents which are intended to conceal their identity and avoid detection by law enforcement, including fictitious driver licenses, passports, photo identification cards, and documents relating to fraudulently obtained vehicle titles, registrations, and insurance;

f) Drug traffickers frequently maintain in their residence currently and previously used wireless telephones and/or electronic communications devices. Drug traffickers frequently store digital and voice messages and phone numbers, belonging to drug purchasers, other drug traffickers, and various individuals or entities working or assisting in the drug trade;

g) Drug traffickers regularly use computers in furtherance of drug trafficking and money laundering crimes, by maintaining illegal records and ledgers on the hard drives (or associated removable media) of said computers. Drug traffickers and money launders also regularly use computers to communicate with one another by way of e-mail, or other telecommunications devices using voice over internet protocol (VOIP), which work in conjunction with computers;

h) Drug traffickers and money launderers maintain books, records, receipts, notes, ledgers, currency and papers which are evidence of the commission of their narcotics and money laundering offenses. The records include tally or ledger sheets; sales and/or purchase invoices; bank, wire transfer and/or other financial institution records; federal and state corporate, partnership, individual and/or other tax and informational returns filed or required to be filed;

3

4. Drug traffickers frequently engage in money laundering in an effort to conceal the proceeds derived from the distribution of illegal drugs and present them as legitimate revenues. Drug traffickers and money launderers will also regularly utilize drug proceeds to procure goods (including but not limited to real estate, jewelry, automobiles, electronics, etc.) and services which will be used in the course of a legitimate business venture. Drug traffickers often use drug proceeds to acquire and/or operate ostensibly legitimate businesses to provide a front for their illegal activity and to facilitate the laundering of drug proceeds;
    a) Drug traffickers and money launderers will regularly purchase goods and services using alias names, nominee names, or the names of criminal associates engaged in the ongoing drug trafficking or money laundering enterprise, or under the name(s) of a business or organization ultimately controlled and/or operated by the drug trafficking or money laundering organization; and
    b) Drug traffickers frequently store currency in multiple locations to avoid discovery and seizure of all drug proceeds from law enforcement during an arrest and/or search.

## PREMISES TO BE SEARCHED

5. This affidavit is being submitted in support of an application for a search warrant for a **detached shed/storage unit on the 15 Thistlewood Way, Piedmont, South Carolina** (hereinafter referred to as the PREMISES TO BE SEARCHED, or TARGET LOCATION). The TARGET LOCATION is more fully described as follows:

6. The TARGET LOCATION is a detached shed/storage unit on the property of a single family dwelling located at 15 Thistlewood Way, Piedmont, South Carolina. The home at the TARGET LOCATION is a white modular home, and sits on a foundation or crawlspace, which is visible from the front of the residence, and composed of red brick or concrete. There is a covered porch with white post facing Thistlewood Way. This residence sits at the end of Thistlewood Way in a cul-de-sac. As one faces the home at the TARGET LOCATION from the street, there is a driveway on the left side of the residence. Also on the left of the residence is a blue and white storage building this blue and white storage building is the place to be searched. The numbers "15" are displayed in the mailbox by the street. A

4

photograph of the property at the TARGET LOCATION is provided in conjunction with this affidavit, and incorporated as "Attachment A."

7. Also to be searched are the electronic contents of any computers, removable media (including thumb drives, removable hard drives, compact discs, or any other device which can maintain digital/electronic data), digital video recorders or hard drives, wireless telephones, or other telecommunications devices located in the shed/storage unit on the property.

8. Based upon my training and experience as a narcotics agent, I know the following:

   a) Drug traffickers regularly obtain and utilize multiple locations (i.e. houses and apartments) so as to allow them to have more than one place to store contraband and/or conduct drug-related business.

   b) Drug traffickers frequently store controlled substances and drug paraphernalia for packaging, diluting, weighing and/or distributing controlled substances in, on, and around residence and/or business, and within vehicles and/or structures located on their property or its surrounding curtilage in an effort to avoid detection by law enforcement. This paraphernalia often includes but is not limited to: scales, plastic bags, diluting agents, etc.

   c) Drug traffickers frequently store currency, financial instruments, precious metals, jewelry, and other items of value, which are the proceeds of drug transactions inside, on, and around their residence and/or place of business.

   d) Drug traffickers frequently have in their possession, whether on their person, inside their vehicle, or in, on, or around their residence, firearms and other weapons. These firearms and weapons are commonly used by drug traffickers to protect their property, including, but not limited to: controlled substances; drug proceeds in the form of currency, jewelry and other real property; and other items of value whose existence may be considered illegal.

5

e) Drug traffickers frequently maintain in their residence and/or business, records of drug transactions, including notes, ledgers, receipts, computer files, photographs, video tapes, digital video recorders and associated hard drives memorializing footage generated by closed circuit or internet-based video camera systems, telephone records, calling cards, and correspondence which contain information on current and past associates, and may be used to identify co-conspirators who have not been identified or located.

f) Drug traffickers frequently maintain fictitious identification and other documents which are intended to conceal their identity and avoid detection by law enforcement, including fictitious driver licenses, passports, photo identification cards, and documents relating to fraudulently obtained vehicle titles, registrations, and insurance.

g) Drug traffickers frequently maintain in their residence currently and previously used wireless telephones and/or electronic communications devices, particularly those wireless telephones and/or electronic communications devices which require the telephone and/or electronic communications device to be purchased. Drug traffickers frequently store digital and voice messages and phone numbers, belonging to drug purchasers, and other drug traffickers.

h) Drug traffickers regularly use computers in furtherance of drug trafficking and money laundering crimes, by maintaining illegal records and ledgers on the hard drives (or associated removable media) of said computers. Drug traffickers and money launders also regularly use computers to communicate with one another by way of e-mail, or other telecommunications devices using voice over internet protocol (VOIP), which work in conjunction with computers.

i) Drug traffickers and money launderers maintain books, records, receipts, notes, ledgers, currency and papers which are evidence of the commission of their narcotics and money laundering offenses. The records include tally or ledger sheets; sales and/or purchase invoices; bank, wire transfer and/or other financial institution records; federal and state

corporate, partnership, individual and/or other tax and informational returns filed or required to be filed.

## FACTS SUPPORTING PROBABLE CAUSE

## BACKGROUND INVESTIGATION

9. This investigation began in October of 2018 as a drug trafficking investigation in the upstate of South Carolina involving kilogram quantities of heroin, fentanyl, and powder cocaine. During the course of the investigation, agents learned that Roosevelt Hunt, Clarence Chandler, and others within this drug trafficking organization (DTO) were shipping large amounts of marijuana and THC related products from California to various residences throughout Greenville and Spartanburg, South Carolina. Through the US Postal Service agents identified several addresses where this DTO shipped controlled substances.

## MAY 15, 2019 SURVEILLANCE OF DELUXE DETAILING

10. On May 15, 2019, agents sent an FBI confidential source to Deluxe Detailing at 1642 Piedmont Highway, Piedmont, South Carolina to purchase controlled substances from Hunt. At approximately 2:30 pm, while conducting surveillance of Deluxe Detailing, agents observed a dark colored Ford F-150 pull in the parking lot. (This vehicle is registered to Ronald Warren Cook Jr., at 15 Thistlewood Way, Piedmont, South Carolina.) A white male exited the truck carrying a small package in his right hand. The package appeared to be wrapped in a white grocery bag. He handed the package to an unknown black male and they walked in the office area. Soon thereafter, the white male left (empty handed) in the Ford truck. Based on a picture provided by the South Carolina Department of Motor Vehicles, this white male resembled Ronald Cook.

## MAY 29, 2019 PARCEL DELIVERY TO 840 GARRISON ROAD, PELZER, SOUTH CAROLINA

11. On May 29, 2019, US Postal Inspector (USPI) Mike Nicholson advised that three suspicious packages mailed from Allied Mechanical, 4107 Waring Road, San Diego, California were en route to 840 Garrison Road, Pelzer, SC. These packages were to be delivered the following day. USPI Nicholas pulled one box for inspection and let the other two be delivered.

12. On May 30, 2019, agents established surveillance in the area of 840 Garrison Road. At approximately 10:34 am, the postal carrier pulled behind 840 Garrison Road and left the packages on the back porch. At approximately 11:50 am, agents observed a Ford F-150 pull behind 840 Garrison Road. Within 3-4 minutes the Ford F-150 (Cook's truck) circled the residence and turned on Garrison Road.

13. On June 3, 2019, USPI Nicholas obtained a federal search warrant for the package he removed from service. Agents executed this search warrant on the same day and inside the package agents found approximately 2 pounds of marijuana, 11 bags of Tetrahydrocannabinol[1] ("THC") "edibles," and 37 THC vape cartridges.

## JUNE 14, 2019 TRASH PULL AT 1642 PIEDMONT HIGHWAY, PIEDMONT, SOUTH CAROLINA

14. On June 14, 2019, agents removed the trash from the trash bin at Deluxe Detailing. In the trash, agents found six large vacuum-sealed plastic bags with the ends cut off and one small vacuum-sealed bag with the end cut off, along with various other documents related to Clarence Chandler. All plastic bags contained the remnants of green plant-like material.[2]

---

[1] Tetrahydrocannabinol is the principal psychoactive constituent of cannabis (marijuana).

[2] Based on the training and experience of agents, this green plant-like material appeared to be marijuana. Agents also know that drug traffickers will transport marijuana in heat-sealed bags to reduce the overall bulk and avoid exposure to law enforcement.

8

## JUNE 13, 2019 PARCEL DELIVERY TO 840 GARRISON ROAD, PELZER, SOUTH CAROLINA

15. On June 13, 2019, USPI Nicholas advised agents that a suspicious package was en route to 840 Garrison Road, Piedmont, South Carolina. At approximately 9:58 pm, agents observed the US Postal Service carrier a package to the back of the residence.
16. At approximately 10:20 am, agents observed a Ford F-150 (Cook's truck) pull to the back of the residence. Agents then observed a white male get out of the truck and walk to the back door of the residence, and then return to the truck. The truck then pulled away from the residence in the direction of Sandy Springs Road.

## SURVEILLANCE OF RONALD COOK ON JULY 12, 2019

17. On July 12, 2019, USPI Nicholas advised agents that suspicious packages were en route to 840 Garrison Road.
18. At approximately 10:00 am, agents observed a US Postal Service carrier deliver three boxes to the back porch of this residence. At approximately 10:35 am, agents observed an unknown white male take the three packages inside the residence.
19. At approximately 10:39 am, agents observed a Ford F-150 (Cook's truck) pull behind the 840 Garrison Road. Agents then observed Cook get out of the truck and go inside the residence. Soon thereafter, Cook left the residence carrying three boxes and got into his truck. Cook then left the property in the Ford F-150, turning toward Sandy Springs Road. Agents followed Cook from 840 Garrison Road to 15 Thistlewood Way, Piedmont, South Carolina, the residence listed on Cook's South Carolina driver's license.

## SEPTEMBER 5, 2019 ARREST OF COOK IN SPARTANBURG, SOUTH CAROLINA

20. On July 23, 2019, US Magistrate Judge Kevin F. McDonald signed a tracking warrant allowing agents to place a tracking device on Cook's Ford F-150.
21. On September 5, 2019, USPI Nicholas advised agents that a suspicious package was en route to 537 Alamo Street in Spartanburg, South Carolina. Agents monitoring the tracker on

9

Cook's truck noticed that around 3:30 pm Cook's truck arrived at 537 Alamo Street, and departed soon thereafter. Agents contacted Spartanburg County Sheriff's Deputy Dolman Ansler and asked him to attempt to stop Cook's truck as he returned to Greenville.

22. Around 3:47 pm, Deputy Collins stopped Cook's Ford F-150 for speeding and driving left of center on I-85 at S.C. 129. Deputy Collins noticed Cook was extremely nervous when he approached the truck. Corporal Amsler then arrived with his K-9. Cook advised deputies that the K-9 may alert to his vape, which contained THC oil. Corporal Amsler performed a free air sniff of the truck with his K9 and advised Deputy Collins that his K9 alerted to the presence of controlled substances.

23. A subsequent search of the vehicle revealed a FedEx box on the back seat with a sender address listing Allied Mechanical, 5920 Aspen Avenue, Minneapolis, MN. Inside this box deputies found three USPS boxes. Cook claimed the boxes contained computer parts which he picked up from a friend in Spartanburg. Further investigation revealed that each box contained two vacuum-sealed bags with a green leafy material resembling marijuana. In the center console, deputies found a Glock box which contained a Glock 23 .40 caliber handgun with two magazines, containing 23 rounds of ammunition. Deputies also found several THC related items in the center console. The Spartanburg County Sheriff's Office crime lab later confirmed that the green leafy material was marijuana.

24. Deputy Collins then handcuffed Cook and explained to him his right under *Miranda*. Cook stated that he understood his rights, but did not wish to answer any questions. Deputies then transported Cook to the Spartanburg County Jail for processing.

## ARREST OF COOK ON JULY 28, 2020

25. At approximately 6:00 am on July 28, 2020 agents arrived at the home at the TARGET LOCATION to arrest Cook on a federal criminal complaint. Cook was wanted for violations of 21 USC § 841(a)(1) and 21 USC § 846.
26. Agents arrived at the home and knocked and announced their presence. Shortly after agents knocked, Cook opened the door wearing only his underwear.
27. As agents were detaining Cook, Aaron Lindsay Brown who described herself as Cook's fiancé walked out of the master bedroom.

10

28. While agents were taking Cook into custody, for officer safety purposes, they asked him if there were any guns in the house. Cook informed officers that there was a gun on the nightstand in the master bedroom.
29. Officers walked into the master bedroom and saw two pistols on the night stand in the bedroom. While they were in the bedroom, officers also saw a shotgun leaving against the wall and two THC vape cartridges on the nightstand. Officers also observed a bag of THC gummies in the master bedroom.
30. After Cook was taken off site for booking, Brown gave agents consent to search the premises. Brown told agents that she lived at the house with Cook and had access to the home and half of the storage building/shed on the property. She gave consent to search everything that she had access to on the property. She told agents that the storage unit/shed was divided into two and she had access to one side and only Cook had access to the other side via a combination lock.
31. While agents were conducting the consensual search of property, they found another larger bag of gummies in the master bathroom.
32. Agents then conducted a consensual search of Brown's half of the shed/storage building. While they were conducting that search, they smelled a strong odor of marijuana coming from Cook's side of the storage building.

## ITEMS TO BE SEIZED

Based upon the aforementioned facts, I believe there is probable cause to believe that the items listed in Attachment B will be found in a search of the TARGET LOCATION. The items listed constitute contraband, evidence and/or instruments of the aforementioned offenses.

33. Based on the aforementioned facts, I respectfully request that a search warrant be issued for the shed/storage building at TARGET LOCATION for the items listed in Attachment B to this affidavit.

11

*Appeared & sworn by telephone*

s/ *Justin K. Newsome*

JUSTIN K. NEWSOME
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

SWORN TO ME VIA TELEPHONE OR
OTHER RELIABLE ELECTRONIC MEANS
AND SIGNED BY ME PURSUANT TO
FED. R. CRIM. P. 4.1 AND 4(d) OR 41(d)(3),
AS APPLICABLE

This __28__ day of __July__, 2020
Greenville, South Carolina

KEVIN F. MCDONALD
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF SOUTH CAROLINA

12

## ATTACHMENT A

A detached shed/storage unit on the property of 15 Thistlewood Way, Piedmont, South Carolina. As you are facing the home which is a single family house trailer, the shed/storage unit to be searched is on the left side of the property.



## ATTACHMENT B

1. The following items to be seized constituting evidence of violations of 21 U.S.C. §§ 841, 846, and 843 and 18 U.S.C. §§ 1956:

    a. Controlled substances possessed in violation of 21 U.S.C. §841(a)(1);
    b. Firearms and other dangerous weapons;
    c. Financial profits, proceeds and instrumentalities of trafficking in narcotics and money laundering, including U.S. currency, virtual currencies including Bitcoins and other items of value;
    d. Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing, and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutants or adulterants such as inositol, vitamin B 12, etc.;
    e. Books, records, receipts, notes, ledgers, and other documents relating to the manufacture, importation and distribution of controlled substances; money laundering, communications between members of the conspiracy, and evidence of the use of apparently legitimate businesses to disguise profits;
    f. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the manufacture, importation and distribution of controlled substances, and money laundering;
    g. Financial records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfer records, cashier's checks and receipts, account records, passbooks, tax records, safe deposit box keys and records, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc.;
    h. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises, including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

Page 1

i. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rent a car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

j. Clothing and accessory items matching the description of those being worn or used by suspects during surveillance operations or depicted on surveillance footage.

k. Latent prints and identifying material from items located at the premises to be searched;

l. Any record, document, image, communication or other form of data relating to the aforementioned offenses, and any cellular telephone, computer, electronic storage or other electronic device capable of storing the same (the "electronic devices").;

m. Any record, document, image, communication or other form of data which shows, either individually or in conjunction with other data, the owner, possessor or user of the electronic devices;

n. Any record, document, image, communication or other form of data which shows, either individually or in conjunction with other data, the location of the possessor of the electronic devices;

o. Any record, document, image, communication or other form of data that identifies, either individually or in conjunction with other data, the Internet or telephone service provided to the electronic devices or any account(s) associated with any communications application (i.e. email, text, chat, instant messaging, social media, file transfer, or similar applications) stored on or accessed using the electronic devices;

p. Any record, document, image, communication or other form of data that, either individually or in conjunction with other data, identifies individuals who are in contact with the owner, possessor or user of the electronic devices;

q. Any documents and data, including but not limited to stored global positioning system (GPS) location data, showing the location of the owner, possessor or user of the electronic devices; and

    r. Any passwords, encryption keys, and other access devices that may be necessary to access the electronic devices.

2. In searching for data capable of being read, stored or interpreted by the electronic devices, law enforcement personnel executing this search warrant may employ the following procedure:

    a. The electronic devices may be transported to an appropriate law enforcement laboratory for review. The electronic devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.
    b. In searching the electronic devices, the examining personnel may examine all of the data contained in the electronic devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the examining personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.
    c. The search of the electronic devices will be completed within a reasonable amount of time not to exceed sixty (60) days from the date of execution of the warrant If, after conducting such a search, the case agents determine that any electronic device contains any data falling within the list of items to be seized pursuant to this warrant, the government may retain the electronic device; otherwise, the government will return the electronic device to the party from which it was seized. If the government needs additional time to determine whether the data on the electronic devices falls within any of the items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty (60) day period from the date of execution of the warrant.